UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| ANTONIO M. FERREIRA, | * * * | |
| Petitioner, | * * | |
| v. | * * | Civil Action No. 22-cv-11352-ADB |
| NELSON B. ALVES, | * * | |
| Respondent. | * * * * | |

**MEMORANDUM AND ORDER**

BURROUGHS, D.J.

On March 30, 2012, Antonio M. Ferreira ("Ferreira" or "Petitioner") was convicted of murder in the first degree following a jury trial in the Middlesex County Superior Court.  See Commonwealth v. Ferreira, 119 N.E.3d 278, 286 (Mass. 2019).  On August 23, 2022, after a series of unsuccessful postconviction appeals and motions, Ferreira filed a petition for a writ of habeas corpus with this Court pursuant to 28 U.S.C. § 2254.  [ECF No. 1 ("Petition")].  After filing his Petition, Ferreira filed a number of motions raising additional issues (Verified Motion For Stay And Abeyance For Exhaustion, [ECF No. 35]; Verified Motion to Supplement Stay, [ECF No. 40]; Verified Motion To File a Supplemental Pleading on the Exhaustion of State Remedies, [ECF No. 41]; Verified Motion To Lift The Stay, Allow An As Of Right Amendment And To Supplement The Appendix, [ECF No. 48]; and Verified Motion for An Enlargement of Time to Prepare A Motion for an Evidentiary Hearing, [ECF No. 51]) ("Subsequent Motions").

For the reasons set forth below, Ferreira's Petition, [ECF No. 1], and Subsequent Motions, [ECF Nos. 35, 40, 41, 48, 51], are DENIED.

1

# I.    BACKGROUND

In Commonwealth v. Ferreira, 119 N.E.3d 278 (Mass. 2019), the Supreme Judicial Court

of Massachusetts ("SJC") described the facts of this case, see id. at 282–86, which are

summarized in relevant part below and "supplemented with other record facts consistent with the

SJC's findings." Yeboah-Sefah v. Ficco, 556 F.3d 53, 62 (1st Cir. 2009) (quoting Healy v.

Spencer, 453 F.3d 21, 22 (1st Cir. 2006)).[1]

## A.    The Crime for Which Petitioner Was Convicted

The victim lived on the fourth floor of an apartment building on Main Street in
Everett. She, along with her sisters, Rose Angela Carla dos Santos and Ana Paula
Carla dos Santos, worked as dancers at a strip club in Chelsea, and later in
Stoughton. She met the defendant at the Chelsea club at some point in 2006. The
defendant became friends with the victim and her sisters, and eventually started
dating the victim. That relationship ended approximately six months prior to the
victim's death. Despite the break up, the defendant continued to socialize with the
victim and her sister, Ana. . . .

In April 2009, the victim entered into a relationship with a married man named
Oliver.[2] On September 26, 2009, a week before the victim's death, the defendant
and Oliver were at the Stoughton club where the victim and her sisters worked. The
victim paid attention to Oliver in between dances, and the defendant did not stay
long. The next day, the defendant visited Ana at her house. He sat down on the
floor, and was "a little sad" and "quiet"; he expressed dismay over the victim's
decision to date a married man.

On September 30, 2009, the defendant and one of his roommates, Darles DeSouza,
attended a barbeque at Ana's house to celebrate her birthday. The defendant got "a
bit agitated" when the victim did not show up. He asked Ana to contact the victim
to get her to join them. When Ana told the defendant that the victim was on a date
and might stop by later, the defendant commented that he had suspected that she
was out with someone. As the night progressed, the defendant called the victim to
see what time she would arrive; he held his cellular telephone in his hand and
appeared to be waiting for her. After the defendant and DeSouza returned to their
Somerville apartment, the defendant remained outside in his silver Nissan Murano
and attempted to telephone the victim.

---

[1] In a habeas case, state court "factual findings are entitled to a presumption of correctness that
can be rebutted only by clear and convincing evidence to the contrary." Rashad v. Walsh, 300
F.3d 27, 35 (1st Cir. 2002) (quoting Ouber v. Guarino, 293 F.3d 19, 27 (1st Cir. 2002)).

[2] This is a pseudonym.

In the early morning hours of October 1, 2009, the defendant telephoned Ana and told her that he could no longer be friends with her "because he wasn't a good person." The defendant explained that he had been using drugs and that his life for the past six months had had no meaning. He asked Ana to give her sister (the victim) a message that "[s]he was dealing with a person who has no life." Ana attempted to console the defendant; she told him to think about his family and children, and that she would help him find another girlfriend. The defendant responded that he only was interested in the victim.

Later that morning, the defendant sent Ana a text message that he was feeling better. He also would "not do anything wrong." Before Ana left for her evening shift at the club, she and the defendant spoke by telephone. The defendant said that he had not wanted to go to work that day because he "wasn't in the mood." He asked Ana, "Is your sister going to work today?" Ana replied, "I don't know. I think so."

At that time, the defendant lived on Melvin Street in Somerville with DeSouza . . . . The defendant slept on a spare mattress in DeSouza's bedroom . . . . In the evening of October 1, 2009, DeSouza came home from work . . . [then later] went into his bedroom, and noticed that the defendant was lying on his mattress wearing a jacket and pants. . . . DeSouza fell asleep. When he woke up the next morning, at 6 A.M., the defendant was talking to someone on his cellular telephone.

The victim worked at the Stoughton club in the evening of October 1–2, 2009, and drove home in her 2006 Honda CR-V shortly after the club closed at 1 A.M. At 1:11 A.M., during her drive home, the victim called her sister Ana; she sounded "normal." At 1:12 A.M., a vehicle that appeared to be consistent with the defendant's Nissan Murano was captured by a surveillance video camera located on the corner of Melvin Street and Broadway in Somerville. The video recording showed this vehicle pull out of a parking space on Melvin Street, near the defendant's apartment building.

At 1:38 A.M., a vehicle resembling the defendant's Nissan Murano was driven around a traffic circle in Everett and headed in the direction of the victim's apartment building. A few minutes later, at 1:42 A.M., a Honda CR-V was driven around the traffic circle, heading in the same direction. At 1:44 A.M., surveillance footage from a camera facing Tileston Street in Everett captured an image of a similar vehicle being driven near the victim's apartment building. Back on Melvin Street in Somerville, at 1:53 A.M., a vehicle that appeared similar to the defendant's Nissan Murano pulled up and parallel parked in the same space from which a vehicle like a Nissan Murano had pulled out fifty-one minutes earlier. A man got out of the vehicle and walked in the direction of the defendant's apartment building.

Ferreira, 119 N.E.3d at 283–84. Around 2 A.M., nearby neighbors reported hearing a woman's

screams. Id. at 284. One of them saw "a man in his twenties or thirties, wearing a tan or brown

jacket and jeans . . . walk down the last few steps of the rear staircase, and jog through the parking lot and around a Dumpster." Id. at 284.  At 4:30 A.M., another neighbor discovered "the victim lying face down in a pool of blood on the landing outside the back door" of the building. Id. at 285.  "She had been stabbed or cut thirty-one times; she had seventeen stab wounds in the torso and multiple knife wounds in both arms."  Id.

### B.    The Investigation

Police investigators spoke to members of the victim's family.  Ana told the officers, "I have a suspect for you."  The police then [located] the defendant. . . .  He agreed to accompany the officers to the Everett police station.  When they arrived at the station, one of the officers noticed injuries on the back of the defendant's hands. An officer contacted a forensic scientist, Eric Koester, who worked at the State police crime laboratory (crime lab), and asked him to come to the police station to test for possible nonvisible blood.  Koester swabbed both of the defendant's hands, and the defendant then left the police station.

A crime lab analyst examined deoxyribonucleic acid (DNA) extracted from the swabs collected by Koester and determined that the victim was included as a possible contributor to a DNA mixture on the back of both of the defendant's hands. The swab from the right hand was a mixture from at least three people.  The defendant matched the major profile, and the victim was included as a potential contributor to the minor profile.  The swab from the left hand contained a mixture of DNA from at least two people; the defendant's DNA matched the major profile, and the victim was included as a potential contributor to the minor profile.

On October 2, 2009, police executed search warrants for the defendant's apartment and his two vehicles (the Nissan Murano and a GMC pickup truck).  Police seized a pair of bloodstained sneakers from a bedroom closet.  Later testing showed that DNA from a bloodstain on the top of the toe of the left sneaker matched the victim's DNA profile.  Another bloodstain on the side of the right sneaker, not visible to the naked eye, contained a mixture of DNA; the major profile from that sample matched the victim's DNA profile.

Police also collected scrapings from underneath the victim's fingernails.  The scrapings from her left hand tested positive for male "Y-STR" DNA, and contained a mixture of DNA from at least four men.  The defendant (and his paternal relatives) were included as possible contributors to the major profile.  Oliver (and his paternal relatives) were included as a potential source of the minor profile in this DNA mixture.  The crime lab obtained both STR and Y-STR DNA results from the victim's right fingernail scrapings.  With respect to the STR profile, the defendant was included as a possible contributor, and Oliver was excluded.  The Y-STR DNA

testing produced a mixture of at least three male profiles.  The defendant (and his
paternal relatives) were included as possible contributors to the major profile; and
Oliver (and his paternal relatives) were included as possible contributors to the
minor profile.

Ferreira, 119 N.E.3d at 285–86.

### C.    Trial, Post-Trial Motions, State Appeals, and the Instant Habeas Petition

On March 30, 2012, after a several week trial, the jury found Petitioner guilty of murder

in the first degree.  [ECF No. 26-5 at 1; ECF No. 26-17 at 24].  He was sentenced to a term of

life in state prison without the possibility of parole.  [ECF No. 25 ("Suppl. Answer Vol. I" or

"S.A.") at 14; ECF No. 26-17 at 24].  In April 2012, Petitioner filed a notice of appeal, [S.A. at

14], which, pursuant to Mass. Gen. Laws ch. 278, § 33E, was entered in the SJC, [S.A. at 19];

see Lee v. Corsini, 777 F.3d 46, 55 (1st Cir. 2015) ("According to the scheme set forth in [§

33E], a defendant who has been convicted of first-degree murder is afforded plenary review on

direct appeal to the SJC.").  In September 2013, the SJC granted Petitioner's request to stay his

appeal.  [Id.].

In February 2015, the Commonwealth provided the defendant with postconviction
discovery.  The discovery included a September 2014 memorandum from the crime
lab reporting that Koester repeatedly had failed proficiency tests in bloodstain
pattern analysis and the recovery of trace evidence.  The Commonwealth also
provided the defendant with a "corrected" DNA STR and Y-STR report that
showed a significant reduction in the probabilities of the combined STR and Y-
STR results appearing randomly in the population.

Ferreira, 119 N.E.3d at 286.

On May 15, 2017, [S.A. at 20], Petitioner filed a motion for a new trial ("First Motion for

a New Trial"), on various grounds, including that "the Commonwealth had failed to provide

exculpatory evidence" related to Koester and the DNA testing, <u>Ferreira</u>, 119 N.E.3d at 286.[3]  The

trial court denied the motion on September 6, 2017.  [S.A. at 16].  Petitioner filed a consolidated

appeal of his conviction and this denial on December 11, 2017 ("Consolidated Appeal").  [S.A.

at 20].  On March 18, 2019, the SJC affirmed the conviction and declined to order a new trial or

reduce the verdict.  <u>Ferreira</u>, 119 N.E.3d at 283.[4]

On October 7, 2019, Ferreira, now proceeding pro se, filed a second motion for a new

trial, styled as a "Motion to Vacate, Set Aside, or Otherwise Correct Sentence Pursuant to

Superior Court Rule 61A" ("Second Motion for a New Trial"), in which he raised additional

issues.  [S.A. at 17].  The trial court denied the motion on February 10, 2020.  [<u>Id.</u>].  Pursuant to

§ 33E, Ferreira applied to a single justice gatekeeper for leave to appeal this denial.  [ECF No. 26

("Suppl. Answer Vol. II" or "S.A. II") at 100]; <u>see</u> <u>Lee</u>, 777 F.3d at 55 ("Following [plenary

review by the SJC], a defendant is free to file any number of motions for a new trial in state

superior court[, but] [h]e is only entitled to appellate review of the denial of such a motion . . . if

a single justice of the SJC determines that the appeal presents a question that is both 'new' and

'substantial,' fit for resolution by the full court, . . . or if it nevertheless raises the specter of 'a

substantial risk of a miscarriage of justice.'" (quoting <u>Commonwealth v. Drew</u>, 856 N.E.2d 808,

813 (2006))).  On January 20, 2021, the single justice gatekeeper denied the application.  [S.A. II

---

[3] Petitioner originally filed this motion in the SJC.  The SJC remanded the motion to the trial court and ordered that any subsequent appeal of the trial court's ruling on that motion be consolidated with Petitioner's appeal of his conviction.  [S.A. at 20].

[4] Petitioner subsequently filed a motion for reconsideration or modification, which the SJC denied on May 8, 2019.  [S.A. at 20].

at 100].[5]

On August 23, 2022, Ferreira filed the instant Petition, [ECF No. 1], which Respondent Superintendent Nelson B. Alves ("Respondent") opposed on February 27, 2023, [ECF No. 33].

### D.    Subsequent Motions in State Court and this Action

After filing the instant Petition, Petitioner filed a third motion for a new trial, raising additional claims of ineffective assistance of counsel.  [ECF No. 35-1 ("Third Motion for a New Trial")].  The trial court denied the motion on August 25, 2023.  [ECF No. 41-1 at 121–32].  Petitioner again applied to a single justice to appeal this denial, [ECF No. 48-1 at 2–42], which was denied on November 10, 2023, [id. at 173].  On November 30, 2023, Petitioner filed a motion for reconsideration, which remains pending.  See [ECF No. 49 at 2].

On April 24, 2023, while his Third Motion for a New Trial was pending, Petitioner filed a motion for stay and abeyance of this action.  [ECF No. 35].  He then filed a motion to "supplement [the] stay" on August 10, 2023, [ECF No. 40], and a motion to "file a supplemental pleading on the exhaustion of state court remedies" on September 19, 2023, [ECF No. 41].  Respondent opposed the motion for stay and abeyance on May 8, 2023, [ECF No. 38], and opposed the motion to file a supplemental pleading on October 16, 2023, [ECF No. 44].  On December 8, 2023, Petitioner moved to amend his Petition to address the issues raised in this Third Motion for a New Trial, [ECF No. 48], which Respondent opposed on December 21, 2023, [ECF No. 49].  On January 25, 2024, Petitioner filed a motion seeking an enlargement of time to

---

[5] Ferreira sought to appeal the single justice's determination, which the SJC denied, explaining that this determination is "final and unreviewable."  Commonwealth v. Ferreira, 188 N.E.3d 954, 954 (Mass. 2022) (internal citation and quotation marks omitted).

prepare a motion for an evidentiary hearing, seemingly related to the issues he raised in his other motions.  [ECF No. 51].[6]

## II.        LEGAL STANDARD

Under the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), when a claim has previously been adjudicated on the merits by a state court, a petitioner may only obtain habeas relief if that adjudication:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  A state court decision is "contrary to" clearly established Supreme Court precedent if: "(1) the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law"; or (2) the state court decides a case differently from a decision of the Supreme Court on a materially indistinguishable set of facts.  Williams v. Taylor, 529 U.S. 362, 405, 413 (2000) (O'Connor, J., concurring).  A state court unreasonably applies federal law when it "correctly identifies the governing legal principles, but (i) applies those principles to the facts of the case in an objectively unreasonable manner; (ii) unreasonably extends clearly established legal principles to a new context where they should not apply; or (iii) unreasonably refuses to extend established principles to a new context where they should apply."  Gomes v. Brady, 564 F.3d 532, 537 (1st Cir. 2009) (quoting Sleeper v. Spencer, 510 F.3d 32, 38 (1st Cir. 2007)).  The unreasonable application clause "affords relief 'if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no "fairminded

---

[6] Although Petitioner seems to be under the impression that the Court granted his April 24, 2023 motion for a stay and abeyance, see [ECF No. 48], the Court has not ruled on this motion.  It remains pending, along with his other Subsequent Motions.

disagreement" on the question.'" Webster v. Gray, 39 F.4th 27, 34 (1st Cir. 2022) (quoting White v. Woodall, 572 U.S. 415, 427 (2014)). Likewise, to warrant relief, "the state court's application of Supreme Court precedent 'must be objectively unreasonable, not merely wrong; even clear error will not suffice.'" Id. (quoting White, 572 U.S. at 419).

An "unreasonable determination of the facts," 28 U.S.C. § 2254(d)(2), is a "demanding showing," Porter v. Coyne-Fague, 35 F.4th 68, 75 (1st Cir. 2022) (quoting Brumfield v. Cain, 576 U.S. 305, 314 (2015)). The Court "may not characterize . . . state-court factual determinations as unreasonable 'merely because [the Court] would have reached a different conclusion in the first instance.'" Brumfield, 576 U.S. at 313–14 (quoting Wood v. Allen, 558 U.S. 290, 301 (2010)). Section 2254(d)(2) "requires that [the Court] accord the state trial court substantial deference." Id. at 314. "Even if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" Wood, 558 U.S. at 301 (alterations in original) (quoting Rice v. Collins, 546 U.S. 333, 341–42 (2006)). In fact, the Court "must accept the state court findings of fact unless convinced by clear and convincing evidence that they are in error." Linton v. Saba, 812 F.3d 112, 116 (1st Cir. 2016) (internal quotation marks and punctuation omitted) (quoting Lynch v. Ficco, 438 F.3d 35, 39 (1st Cir. 2006)).

Thus, to obtain habeas relief, "a state prisoner must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Harrington v. Richter, 562 U.S. 86, 103 (2011). "The petitioner carries the burden of proof." Cullen v. Pinholster, 563 U.S. 170, 181 (2011) (citing Woodford v. Visciotti, 537 U.S. 19, 24 (2002)). "In conducting habeas review, a federal court is limited to deciding

9

whether a conviction violated the Constitution, laws, or treaties of the United States." Estelle v. McGuire, 502 U.S. 62, 68 (1991) (first citing 28 U.S.C. § 2241; and then citing Rose v. Hodges, 423 U.S. 19, 21 (1975)).  Furthermore, "[e]rrors based on violations of state law are not within the reach of federal habeas petitions unless there is a federal constitutional claim raised." Kater v. Maloney, 459 F.3d 56, 61 (1st Cir. 2006) (citing Estelle, 502 U.S. at 67–68).  "'[T]he gap between erroneous state court decisions and unreasonable ones is narrow,' and 'it will be the rare case that will fall into this gap.'" O'Laughlin v. O'Brien, 568 F.3d 287, 299 (1st Cir. 2009) (quoting Evans v. Thompson, 518 F.3d 1, 6 (1st Cir. 2008)).  "[H]abeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington, 562 U.S. at 102–03 (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring)).

A federal court also cannot grant habeas relief unless a petitioner has first exhausted his federal constitutional claims in state court. See 28 U.S.C. § 2254(b)(1)(A).  A petitioner "must give the state courts an opportunity to act on his claims before he presents those claims to a federal court in a habeas petition." O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999).  A claim for habeas relief is exhausted if it has been "fairly and recognizably" presented in state court. Sanchez v. Roden, 753 F.3d 279, 294 (1st Cir. 2014) (quoting Casella v. Clemons, 207 F.3d 18, 20 (1st Cir. 2000)).  In other words, "a petitioner must have 'tendered his federal claim [in state court] in such a way as to make it probable that a reasonable jurist would have been alerted to the existence of the federal question.'" Id. (quoting Casella, 207 F.3d at 20).

Although a federal court may not grant habeas relief related to unexhausted claims, if "a habeas petitioner's unexhausted claim is patently without merit, the AEDPA allows a federal court, in the interests of judicial economy, to dispose of that claim once and for all." Coningford

v. Rhode Island, 640 F.3d 478, 483 (1st Cir. 2011) (first citing 28 U.S.C. § 2254(b)(2); and then

citing Granberry v. Greer, 481 U.S. 129, 135 (1987)).

## III.    DISCUSSION

### A.    Petition

The Petition raises eleven bases for relief, see [ECF Nos. 1, 2], some of which Petitioner

originally raised in his First Motion for a New Trial and in his Consolidated Appeal and the rest

in his Second Motion for a New Trial.

#### 1.    Issues in Petitioner's First Motion for a New Trial and Consolidated Appeal (Issues #1–5)

Issues #1–5, originally raised in Petitioner's First Motion for a New Trial, were addressed

by the SJC in Petitioner's Consolidated Appeal, see Commonwealth v. Ferreira, 119 N.E.3d 278

(Mass. 2019).[7]   Respondent appears to concede that Petitioner exhausted his state remedies for

these issues.   As noted above, in order for the Court to disturb a state court's adjudication on the

merits of these issues, Petitioner must show that the state court decision was either (1) "contrary

---

[7] Issue #1: The trial judge abused her discretion by denying Petitioner's motion for a new trial, because the alleged failure to provide these exculpatory documents to Petitioner until after conviction was prejudicial, see [ECF No. 1 at 1; ECF No. 2 at 7–13; S.A. at 46–56];

Issue #2: The trial judge abused her discretion by denying Petitioner's motion to suppress, because the police should have obtained a warrant prior to swabbing Petitioner's hands and there was no probable cause to search Petitioner's apartment, see [ECF No. 1 at 1–2; ECF No. 2 at 13–21; S.A. at 59–65];

Issue #3: The trial judge erred when she allowed the Commonwealth's motion to admit verbal and adoptive admissions, see [ECF No. 1 at 2; ECF No. 2 at 21–25; S.A. at 66–71];

Issue #4: The trial judge abused her discretion by admitting prior recorded grand jury testimony, see [ECF No. 1 at 2; ECF No. 2 at 25–28; S.A. at 71–75]; and

Issue #5: The motion judge also violated Petitioner's right to due process of law when she denied his motions for a directed verdict, see [ECF No. 1 at 2; ECF No. 2 at 28–47; S.A. at 75–76].

to" or an "unreasonable application of, clearly established Federal law," as determined by the decisions of the United States Supreme Court, or (2) "based on an unreasonable determination of the facts" presented in the state-court proceeding.  28 U.S.C. §§ 2254(d)(1)–(2).

     i.  <u>Issue #1</u>

  In Issue #1, Petitioner raises a <u>Brady</u> claim.  <u>See</u> [ECF No. 2 at 7–13]; <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963) ("[T]he suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment . . . .").  Under the federal <u>Brady</u> standard, to establish a Due Process violation based on the government's failure to disclose evidence, a petitioner must show that the evidence is "favorable to the accused, either because it is exculpatory, or because it is impeaching"; the evidence was "suppressed by the State, either willfully or inadvertently; and prejudice . . . ensued."  <u>Strickler v. Greene</u>, 527 U.S. 263, 282 (1999).  To establish prejudice, the Petitioner must show that such "evidence is material either to guilt or to punishment," <u>id.</u> at 280 (quoting <u>Brady</u>, 373 U.S. at 87), meaning that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," <u>id.</u> (quoting <u>United States v. Bagley</u>, 473 U.S. 667, 682 (1985)).[8]

---

[8] In evaluating this argument, the SJC applied the state standard, which requires that a "defendant . . . establish (1) that the evidence was in the possession, custody, or control of the prosecutor or a person subject to the prosecutor's control; (2) that the evidence is exculpatory; and (3) prejudice."  <u>Ferreira</u>, 119 N.E.3d at 288 (quoting <u>Commonwealth v. Sullivan</u>, 85 N.E.3d 934, 945–46 (Mass. 2017)).  As to the prejudice prong, where, as here, "defendant's pretrial motion was merely a general request for exculpatory evidence, the defendant must show that the withheld evidence would probably have been a real factor in the jury's deliberations."  <u>Id.</u> (internal quotation marks omitted) (quoting <u>Commonwealth v. Watkins</u>, 41 N.E.3d 10, 20 (Mass. 2015)).  Said differently, under the state standard, the question is "whether there is a substantial risk that the jury would have reached a different conclusion if the evidence had been admitted at trial."  <u>Id.</u> at 288–89 (quoting <u>Commonwealth v. Tucceri</u>, 589 N.E.2d 1216, 1223 (Mass. 1992)).

In his First Motion for a New Trial, Petitioner argued that the Commonwealth failed to disclose that forensic scientist "Koester [had] failed required proficiency tests" until after trial, and Petitioner was thus prejudiced because this exculpatory evidence casts serious doubt on the DNA evidence presented at trial.  Ferreira, 119 N.E.3d at 286; see also [ECF No. 2 at 7–13; ECF No. 2-1 at 463–74 (citing, inter alia, Brady, 373 U.S. at 87)].  In evaluating this argument, the SJC concluded that it did appear "that the Commonwealth, through the State police, was aware of [Koester's] deficient performance at least before the end of the defendant's trial," but also determined that Petitioner could not establish prejudice given "Koester's limited role in this case." Ferreira, 119 N.E.3d at 288–89.  Specifically, the SJC found that

> Koester responded to the crime scene, marked the location of evidence, and performed a bloodstain pattern analysis that was not central to the case.  Later that day, Koester swabbed the defendant's hands at the police station.  The swabs were submitted to another scientist for DNA testing.  Although Koester officially supervised the two criminalists who searched the defendant's apartment, Koester was not present when they recovered the defendant's sneakers, and he did not test the sneakers for the presence of blood or DNA.

---

While the SJC's language may be different from the Supreme Court's own articulation – styled as "substantial risk" versus "reasonable probability" – that alone is not fatal under § 2254(d)(1).  A state court need not use identical language or even cite to an applicable Supreme Court decision. . . .

[T]he First Circuit has found the SJC's "substantial risk" standard "akin to" the Supreme Court's "reasonable probability" standard. . . .  The First Circuit in Jackson [v. Marshall, 864 F.3d 1, 11 (1st Cir. 2017)] noted that the SJC in fact considers its standard "more favorable to petitioners than the Brady standard."

Hernandez v. Kenneway, 575 F. Supp. 3d 221, 225 (D. Mass. 2021) (alteration omitted) (quoting Jackson, 864 F.3d at 11).  Where, as here, "a state-court adjudication of an issue framed in terms of state law is nonetheless entitled to deference under section 2254(d)(1) as long as the state and federal issues are for all practical purposes synonymous and the state standard is at least as protective of the defendant's rights as its federal counterpart."  Foxworth v. St. Amand, 570 F.3d 414, 426 (1st Cir. 2009).

Id. (citing Commonwealth v. Hernandez, 113 N.E.3d 828, 835–36 (Mass. 2018)).  Thus, the SJC concluded that the trial court's finding that "Koester played a relatively minor role in the criminal investigation against the defendant [wa]s supported by the trial record."  Id.

Petitioner argues that the SJC's determination that Koester played a minor in the investigation was unreasonable, because Koester conducted the swab of his hands and collected blood samples at the crime scene.  [ECF No. 2 at 9–10].  This argument "fails to offer [any] new evidence or otherwise challenge the SJC's findings of fact and instead, at best, offers a different interpretation of the evidence that was before the state court, which is insufficient to overcome the presumption of correctness."  Seino v. Ladouceur, 630 F. Supp. 3d 256, 262 n.2 (D. Mass. 2022) (citing Teti v. Bender, 507 F.3d 50, 59 (1st Cir. 2007)).  The Court thus finds that the SJC's determination of the facts was not unreasonable.

The Court also finds that the SJC's application of the law to these facts was not unreasonable.  In Hernandez v. Kenneway, 575 F. Supp. 3d 218 (D. Mass. 2021), in which another petitioner sought habeas relief on the basis that his conviction depended on unreliable DNA evidence provided by Koester, the SJC "concluded that the Koester evidence should have been disclosed," id. at 222, but that a new trial was not warranted "because the new evidence would not have been a real factor in the jury's deliberations," id. (quoting Commonwealth v. Hernandez, 113 N.E.3d at 835–36) (internal quotation marks omitted).  In that case, Koester took on a larger role by "testif[ying] as the crime scene supervisor" about "gunshot residue to the victim's clothes," id. at 221, but another session of this Court nonetheless found that it "was not unreasonable for the SJC to conclude that the [undisclosed] Koester evidence would not likely have changed the jury's verdict," id. at 227 (denying the petitioner's motion for habeas relief).  Given the

other evidence in the record, discussed <u>infra</u>, the Court reaches the same conclusion here.  The Court therefore finds that habeas relief is not warranted on this ground.

> ii.        <u>Issue #2</u>

In Issue #2, Petitioner challenges the trial court's denial of his motion to suppress evidence from the swab of his hands and the search of his apartment.  <u>See</u> [ECF No. 2 at 13–21]. "[W]here the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, a state prisoner may not be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial." <u>Stone v. Powell</u>, 428 U.S. 465, 494 (1976).  "'[A] full and fair opportunity' to litigate means that the state has made available to defendants a set of procedures suitably crafted to test for possible Fourth Amendment violations." <u>Sanna v. Dipaolo</u>, 265 F.3d 1, 9 (1st Cir. 2001) (citing <u>Pignone v. Sands</u>, 589 F.2d 76, 79 (1st Cir. 1978)).  Here, following a two-day evidentiary hearing, the trial court denied Petitioner's motion to suppress, finding that "the warrantless search of the defendant's hands was supported by both probable cause . . . and exigent circumstances . . . [, and] the search warrant affidavit established probable cause to search the defendant's apartment." <u>Ferreira</u>, 119 N.E.3d at 290.  The SJC then conducted an independent review of the trial court's findings of fact and conclusions of law and affirmed.  <u>Id.</u> at 293–94.  Because Petitioner had a full and fair opportunity to litigate his claims, this  Court lacks authority to review the substance of the state courts' decisions.  <u>See</u> <u>Barbosa v. Gelb</u>, No. 13-cv-12285, 2014 WL 4843981, at *2 (D. Mass. Sept. 26, 2014) (finding petitioner had a full and fair opportunity to litigate his claims where his "motion to suppress was fully briefed by both parties[;] . . . was carefully considered by the Plymouth County Superior Court in a seven-page memorandum and order[;] [and] [t]he SJC affirmed the Superior Court decision after conducting an independent

review") (citing <u>Sanna</u>, 265 F.3d at 9)).  Accordingly, the Court may not grant habeas relief on this ground.

iii.     <u>Issues #3 and #4</u>

In Issues #3 and #4, Petitioner argues that the trial judge abused her discretion by admitting certain statements as adoptive admissions (Issue #3) and portions of a witness's grand jury testimony (Issue #4), and suggests that admitting this evidence violated due process.  [ECF No. 2 at 21–28]; <u>see also</u> [S.A. at 71 (arguing to the SJC that this "abuse of discretion denied Ferreira his right to due process")].  As relevant to Issue #3:

> The Commonwealth moved in limine to admit certain statements by [Petitioner] as adoptive admissions or as consciousness of guilt.  [Petitioner] opposed the motion. After a hearing, the judge allowed the testimony to be introduced, with a limiting instruction, as an adoptive admission.
>
> At trial, over [Petitioner]'s objection, Ana [the victim's sister] testified that, when she learned of the victim's death from her sister Rose, she called [Petitioner] and asked him, "Where is my sister?"  [Petitioner] answered, "I don't know.  I haven't seen her for a week."  Ana then accused the defendant of killing her sister, saying, "You killed my sister.  You can run.  I'm gonna kill you.  I'm gonna kill your family.  I'm gonna kill your children.  I'm gonna kill everyone."  [Petitioner] hung up.
>
> Immediately after this testimony was introduced, the judge gave a limiting instruction and told the jury that they must "be sure that any conclusions [they] draw are fair conclusions," and that they also must be sure that the [Petitioner] "heard any accusation and understood its significance."  She further instructed that the jury must be "satisfied that it is a fair conclusion that a person would always speak up in a situation like that if he were innocent.  After all, no one is required to respond to any negative comment made about him, and there may be other factors in a given situation apart from guilt or innocence with respect to the particular accusation that might explain why a person did not choose to respond."

<u>Ferreira</u>, 119 N.E.3d at 294.  As relevant to Issue #4:

> The disputed [grand jury] testimony unfolded as follows.  The prosecutor asked [Petitioner]'s roommate, Washington Silveira, "What did the defendant tell you about [the victim] and his relationship with her?"  Silveira answered, "[a]t first he would say that the relationship was good . . . ."  The prosecutor then asked if the relationship had changed at any point.  Silveira responded that he "could not

remember the exact words" the defendant used to describe his changed relationship with the victim.  When the prosecutor attempted to refresh Silveira's recollection with his grand jury testimony, Silveira testified, "[a]t the moment I don't remember anymore.   But if I said that at that time, that's what happened."

Id. at 295.

The judge then allowed the prosecutor to "read to the jury the following excerpt of

Silveira's grand jury testimony,"

> Q.: "Did [the defendant] ever talk to you about [the victim]?"
> A.: "He told me once that he had to forget that low life, that he had to get used to forgetting about low life women."
> Q.: "Did he refer to her as low life woman, or did he specifically use the word whore?"
> A.: "Yes, he did specifically used the word whore."
> Q.: "And do you remember when this was in relation to when [the victim] was killed?"
> A.: "It was a long time ago. I don't recall exactly.  Maybe two or three months before."
> Q.: "So that would have been sometime in July or August of 2009?"
> A.: "It could be."

Ferreira, 119 N.E.3d at 295–96 (alterations in original).

In evaluating these issues, the SJC concluded that the judge had erred in admitting both

pieces of evidence, but that Petitioner had not suffered prejudice as a result, and thus a new trial

was not warranted on these grounds.  Id. at 294–96.  Specifically, the SJC concluded that "there

was no prejudice to the defendant from [the adoptive] admission requiring reversal" because

> [o]ther testimony already had been introduced indicating that Ana accused the defendant of killing her sister; indeed, that testimony was introduced by the defendant himself in his challenge to the manner in which the police purportedly rushed to judgment during the investigation.  The jury most likely gave the testimony little weight given that Ana's threats did not reasonably call for a response.  In addition, as previously stated, the case against the defendant was overwhelming.

Id. at 295.  Further, it concluded that the grand jury

> testimony that the defendant referred to the victim as a "low life" and "whore" a few months before she was killed likely had little impact on the jury. . . .  The

> prosecutor did not refer to these statements in her closing argument.   The
> significance of the derogatory comments is outweighed by the threats made by the
> defendant himself in the days immediately prior to the stabbing, on September 30
> and October 1, 2009, as well as the circumstantial evidence connecting the
> defendant to the killing.   A new trial is not required on this basis.

Id. at 296 (internal citation omitted).

To establish grounds for habeas relief related to an alleged constitutional error at trial, a Petitioner must satisfy both the AEDPA [§ 2254] standard and the Brecht standard, which requires the Petitioner to "show that the error had a 'substantial and injurious effect or influence' on the outcome of his trial." Brown v. Davenport, 596 U.S. 118, 126 (2022) (quoting Brecht v. Abrahamson, 507 U.S. 619, 623 (1993)).   "[W]here [§ 2254] asks whether every fairminded jurist would agree that an error was prejudicial, Brecht asks only whether a federal habeas court itself harbors grave doubt about the petitioner's verdict." Id. at 136.   Likewise, under § 2254, the Court considers the state court decision in light of "clearly established Federal law, as determined by the Supreme Court of the United States," not lower court decisions, not Supreme Court dicta, and not later decided Supreme Court cases.   Id. (quoting 28 U.S.C. § 2254(d)(1)).

The Court finds that the SJC's harmlessness determinations are not unreasonable and the Court itself does not "harbor[] grave doubt about the petitioner's verdict," Brown, 596 U.S. at 136, because, based on the strength of the Commonwealth's case against Petitioner at trial, see infra, the outcome likely would not have changed even if this evidence had not been admitted. As such, habeas relief is not warranted on these grounds.

    iv.  Issue #5

As to Issue #5, Petitioner contends that he was entitled to a directed verdict because there was insufficient evidence to support the conviction, where the Commonwealth's evidence was "piecemeal," included hearsay and "innuendo," required "piling inferences upon inferences," and

both the trial court and SJC ignored other exculpatory evidence.  [ECF No. 2 at 28–46].  As the Petitioner recognizes, sufficiency challenges are governed by the Supreme Court's decision in Jackson v. Virginia, 443 U.S. 307 (1979).[9]  Jackson held that the constitutional right to due process guarantees "that no person shall be made to suffer the onus of a criminal conviction except upon sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable doubt of the existence of every element of the offense."  443 U.S. at 316.  "More succinctly, the relevant test . . . from Jackson is 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'"  O'Laughlin, 568 F.3d at 299 (quoting Jackson, 443 U.S. at 319).

In the habeas context, "Jackson claims face a high bar."  Coleman v. Johnson, 566 U.S. 650, 651 (2012).  The question for the reviewing court is not whether the state court was correct in finding the evidence supported the conviction beyond a reasonable doubt, but instead "whether the SJC's application of Jackson to [a petitioner]'s case was 'objectively unreasonable.'"  O'Laughlin, 568 F.3d at 299.[10]

---

[9] Here, the SJC invoked Commonwealth v. Latimore, 393 N.E.2d 370, 374–75 (Mass. 1979), see Ferreira, 119 N.E.3d at 289–91, which adopted Jackson as the sufficiency of the evidence standard in Massachusetts, Commonwealth v. Mendez, 69 N.E.3d 968, 979 (Mass. 2017), abrogated on other grounds by Commonwealth v. Privette, 204 N.E.3d 967 (Mass. 2023); see Leftwich v. Maloney, 532 F.3d 20, 24 (1st Cir. 2008) ("Because the Latimore court adopted the governing federal constitutional standard as the Massachusetts standard for sufficiency of the evidence challenges, . . . we can securely reason that in scouring the record for Latimore error and finding none the SJC effectively answered the federal constitutional question." (citation omitted)).  "That the SJC applied Latimore rather than Jackson does not diminish its claim to deference under AEDPA, as 'the Latimore test . . . is functionally identical to the Jackson . . . standard.'"  Linton, 812 F.3d at 123−24 (citation omitted) (quoting Logan v. Gelb, 790 F.3d 65, 71 (1st Cir. 2015)).

[10] "As a general matter, sufficiency claims are evaluated under [§] 2254(d)(1)," Correa v. Ryan, 216 F. Supp. 3d 193, 196 (D. Mass. 2016) (first citing O'Laughlin, 568 F.3d at 298; and then citing Winfield v. O'Brien, 775 F.3d 1, 8 (1st Cir. 2014)), that is the "contrary to . . . or . . .

The SJC found that the record, appropriately framed in the light most favorable to the

Commonwealth, established that:

- The Petitioner had a prior romantic relationship with the victim,

- That, several days before the victim was killed, the Petitioner was frustrated with the victim, preoccupied with her whereabouts, and told her sister that "he had been using drugs and that his life for the past six months had had no meaning" and that he had no romantic interest in anyone other than the victim,

- That a car resembling the Petitioner's was in close proximity to the victim's apartment on the night she was killed,

- That there was a person near the victim's apartment, also around the time the victim was killed, who resembled the Petitioner,

- That the victim's body was left outside her apartment, with her handbag, cell phone, and wallet, which contained credit cards and several hundred dollars in cash; and

- That DNA evidence linked the Petitioner to the crime.

See Ferriera, 119 N.E.3d at 283–86.  The SJC agreed with the trial judge that the evidence

supporting the conviction was "overwhelming."  Id. at 290.  The Court finds that this evaluation is

not unreasonable, and therefore habeas relief is not appropriate on this ground.

### 2.   Issues in Petitioner's Second Motion for a New Trial (Issues #6–12)

Issues #6–12 were originally raised in Petitioner's Second Motion for a New Trial, which

---

unreasonable application of . . . law" prong of the AEDPA, rather than under § 2254(d)(2), the "unreasonable determination of facts" prong, 28 U.S.C. § 2254(d)(1)–(2).

Here, it is not entirely clear whether Petitioner challenges the SJC's adjudication under (d)(1), (d)(2), or both prongs.  Regardless, "[e]ven were the Court to proceed under [§] 2254(d)(2), . . . this would require evaluating the reasonableness of the state court's factual findings under Jackson v. Virginia, . . . which provides the sufficiency standard."  Correa, 216 F. Supp. 3d at 197 (citation omitted); see O'Laughlin, 568 F.3d at 299 ("[T]he 'unreasonable application of' prong of § 2254(d)(1) 'reduces to a question of whether the state court's derivation of a case-specific rule from the [Supreme] Court's generally relevant jurisprudence appears objectively reasonable.'" (alterations in original) (quoting Hurtado v. Tucker, 245 F.3d 7, 16 (1st Cir. 2001))).  Accordingly, the Court discerns "no meaningful difference" between the relevant inquiry under § 2254(d)(1) versus § 2254(d)(2) under these circumstances.  Correa, 216 F. Supp. 3d at 197.

was denied by the trial court, [S.A. at 17], and which a single justice gatekeeper found did not warrant appeal to the full court, [S.A. II at 100].

       i.       Issues #7–10

Respondent argues that Issues #7–10 are procedurally defaulted.  [ECF No. 33 at 38–41]. "[T]he fact that a claim is procedurally defaulted in state court is an adequate and independent state ground precluding federal habeas relief."  Hodge v. Mendonsa, 739 F.3d 34, 43 (1st Cir. 2013) (quoting Walker v. Russo, 506 F.3d 19, 21 (1st Cir. 2007)).  "Grounded in comity and federalism, the procedural default rule bars § 2254 habeas relief 'when a state court declined to address a prisoner's federal claims because the prisoner had failed to meet a state procedural requirement.'"  Powell v. Tompkins, 783 F.3d 332, 344 (1st Cir. 2015) (quoting Coleman, 501 U.S. at 729–30), cert. denied, 136 S. Ct. 1448 (2016).  "A cognizable procedural default bars an inquiry into the merits of the claim unless a petitioner demonstrates cause and prejudice, or makes a rare showing of a miscarriage of justice."  Alcequiecz v. Ryan, No. 14-cv-11693, 2017 WL 2346837 (D. Mass. May 30, 2017) (citing Wainwright v. Sykes, 433 U.S. 72, 86–87, 91 (1977)).

As noted above,

> [a]ccording to the scheme set forth in [Mass. Gen. Laws ch. 278, § 33E], a defendant who has been convicted of first-degree murder is afforded plenary review on direct appeal to the SJC. . . .  Following such review, a defendant is free to file any number of motions for a new trial in state superior court.

Lee, 777 F.3d at 55 (citing Mass. Gen. Laws ch. 278, § 33E).  That said, "[i]f a defendant fails to raise a claim that is generally known and available at the time of trial or direct appeal or in the first motion for postconviction relief, the claim is waived."  Commonwealth v. DiBenedetto, 203 N.E.3d 579, 588 (Mass. 2023) (alteration in original) (quoting Rodwell v. Commonwealth, 732 N.E.2d 287, 289 (Mass. 2000)); see also Commonwealth v. Pisa, 425 N.E.2d 290, 293 (Mass.

1981) ("[Section 33E] requires that the [Petitioner] present all his claims of error at the earliest

possible time, and failure to do so precludes relief . . . .  Issues not raised at trial or pursued in

available appellate proceedings are waived." (internal citations omitted)).  Further,

> [Petitioner] is only entitled to appellate review of the denial of such [subsequent]
> motion[s for a new trial], . . . if a single justice of the SJC determines that the appeal
> presents a question that is both "new" and "substantial," fit for resolution by the
> full court, . . . or if it nevertheless raises the specter of "a substantial risk of a
> miscarriage of justice."

Lee, 777 F.3d at 55 (quoting Drew, 856 N.E.2d at 813).

> A single justice's denial of a § 33E application can constitute a procedural default, and
>
> [w]hether [it does] depends on whether the reason for the denial was that the issues
> were not new or not substantial.  "The single justice's determination that an issue
> is not new within the meaning of § 33E is tantamount to a finding of procedural
> default," but "a determination that the issues are new and simply not substantial
> resolves the claims on the merits and does not signal procedural default." . . .  "Thus,
> 'it is only the failure to satisfy the new prong of the § 33E rule that signals
> procedural default.'"

Mathews v. Silva, No. 09-cv-12200, 2020 WL 1703795, at *7–8 (D. Mass. Apr. 8, 2020) (first

quoting Lee, 777 F.3d at 55 (internal quotation marks omitted); and then quoting Yacouba-Issa

v. Calis, No. 16-cv-12124, 2019 WL 1332922, at *12 (D. Mass. Mar. 25, 2019), aff'd, 22 F.4th

333 (1st Cir. 2022)).

Here, in evaluating the Petitioner's application to appeal the trial court's denial of his

Second Motion for a New Trial, the single justice explained that

> [a] defendant is not entitled to appeal a denial of a post-appeal motion for a new
> trial following plenary review on direct appeal under G. L. c. 278, § 33E, unless a
> single justice of this court allows it "on the grounds [sic] that it presents a new and
> substantial question which ought to be determined by the full court."

[S.A. II at 257 (quoting DiBenedetto, 57 N.E.3d at 994)].  The single justice then denied the

application.  [Id.].

The Court can reasonably infer that the single justice concluded that these issues were (1) not new, (2) not substantial, and/or (3) neither new nor substantial, but the single justice offered no guidance as to which of these three formulations is correct.  See [S.A. II at 257–58]. Therefore, "[t]he Court will . . . look to the record to determine the facts and procedural underpinnings of the ruling."  Mathews, 2020 WL 1703795, at *8.

In Issues #7–10, Petitioner argues that:

- His due process rights were violated because he was denied availability and attendance at the pretrial conference held on January 6, 2010 (Issue #7), [ECF No. 2 at 49];

- He was denied effective assistance of trial counsel, based on trial counsel's alleged failure to challenge the Commonwealth's experts, retain their own experts or investigators, request certain jury instructions, present certain exculpatory evidence, present an alibi defense, and object to the prosecution's closing argument (Issue #8), [id. at 50–51];

- The trial judge's instruction to the jury related to "proof beyond a reasonable doubt" was erroneous as a matter of law (Issue #9), [id. at 51–52]; and

- The trial court's instructions created an irrebuttable presumption that he possessed a weapon (Issue #10), [id. at 52–54].

"An issue is not new within the meaning of G. L. c. 278, § 33E, where either it has already been addressed, or . . . it could have been addressed had the defendant properly raised it. . . ."  DiBenedetto, 203 N.E.3d at 588 (quoting Commonwealth v. Ambers, 493 N.E.2d 837, 839 (Mass. 1986)).  An issue is substantial if "it is meritorious . . . in the sense of being worthy of consideration by an appellate court."  Commonwealth v. Gunter, 945 N.E.2d 386, 392 (Mass. 2011).

Respondent argues that "[s]ince each of these claims ##7-10 could (and should) have been raised at trial or on appeal, they are not new."  [ECF No. 33 at 40 n.13].

Petitioner does not directly address this issue but asserts in the context of Issue #11 (ineffective assistance of appellate counsel) that because trial counsel and appellate counsel, who

also handled Petitioner's post-conviction briefing, both worked for the Committee for Public

Counsel Services ("CPCS"), "this was a conflict of interest," which prompted appellate counsel

not to raise claims of ineffective assistance of *trial* counsel.  See [ECF No. 2 at 54–55 (emphasis

added)].  The Court is not aware of any Massachusetts caselaw finding (or even evaluating

whether) an appellate counsel's improper refusal to raise ineffective assistance claims renders

them "[un]available," and therefore new, within the meaning § 33E.  That said, even assuming

such claims would be "new" and therefore not procedurally defaulted, the Court finds that

Petitioner has failed to substantiate his claim that appellate counsel's decision not to raise these

issues was motivated by a conflict rather a strategic choice or legal determination as to their

merits.[11]  See Lattimore v. DuBois, 311 F.3d 46, 57 (1st Cir. 2002) ("Appellate counsel is not

---

[11] Petitioner's trial counsel appears to have been attorneys John C. Hayes and Kelli Porges, see
[S.A. at 9, 13 (trial court docket); S.A. II at 240–41 (September 2019 letters indicating that
Hayes and Porges served as trial counsel)], and at least Hayes worked for the Public Defender
Division of CPCS.  James E. Methe appears to have been Petitioner's post-conviction and
appellate counsel, see [S.A. at 14 (trial court docket showing that Methe made his first
appearance for Petitioner in September 2012, post-trial); id. at 19 (SJC docket listing Methe as
Petitioner's counsel)], and had some involvement with CPCS, see [S.A. II at 245–46 (May 2019
letter from Methe alerting Petitioner that following the SJC's affirmance of his conviction, he
could file a federal habeas petition, which Methe had received permission to assist Petitioner
with, or a petition for writ of certiorari to the United States Supreme Court or a motion for a new
trial in the state trial court, which Methe would not "be requesting permission from CPCS to
pursue")].

Even assuming that Methe, like Hayes, was employed by CPCS, the Court declines to conclude
from these facts alone that Methe had a conflict and therefore refused to raise ineffective
assistance of trial counsel claims on appeal.  See, e.g., Webb v. Wyo. Dep't of Corr. Medium
Corr. Inst. Warden, 849 F. App'x 729, 738–39 (10th Cir. 2021) ("Our case law recognizes no
inherent conflict when the same public defender's office employs appellate and trial counsel. . . .
[Petitioner] speculates that appellate counsel chose to protect trial counsel by omitting the
ineffective assistance claims he requested.  But this does not show 'that a relationship to trial
counsel hindered his appellate counsel.'" (quoting Cuesta-Rodriguez v. Carpenter, 916 F.3d 885,
902 (10th Cir. 2019) (rejecting habeas petitioner's "infer[ence] [of] potential bases for conflicts"
and "invit[ation] . . . to imagine the dilemma appellate counsel might be placed in" (brackets and
quotations omitted)), cert. denied, 140 S. Ct. 844 (2020))), cert. denied sub nom. Webb v.
Pacheco, 142 S. Ct. 184 (2021).

required to raise every non-frivolous claim, but rather selects among them to maximize the likelihood of success on the merits." (citing Smith v. Robbins, 528 U.S. 259, 288 (2000))).  The Court likewise sees no other reason why these claims could not have been raised earlier.  Therefore, the Court finds that these issues are not "new" within the meaning of § 33E and therefore were procedurally defaulted.

Accordingly, the Court may not grant habeas relief on these grounds unless Petitioner "demonstrate[s] cause for the default and actual prejudice as a result of the alleged violation of federal law."  Coleman, 501 U.S. at 750.  "Cause for procedural default 'must ordinarily turn on whether the prisoner can show that some objective factor external to the defense impeded counsel's efforts to comply with the State's procedural rule.'"  Costa v. Hall, 673 F.3d 16, 25 (1st Cir. 2012) (quoting Murray v. Carrier, 477 U.S. 478, 488 (1986)).  Though not "an exhaustive catalog of such objective impediments to compliance with a procedural rule, . . . a showing that the factual or legal basis for a claim was not reasonably available to counsel, or that 'some interference by officials,' made compliance impracticable, would constitute cause under this standard."  Murray, at 488 (first citing Reed v. Ross, 468 U.S. 1, 16 (1984); and then quoting Brown v. Allen, 344 U.S. 443, 486 (1953)).  Respondent urges that Petitioner has not made any argument related to cause or prejudice.  [ECF No. 33 at 40–41].  Again, if appellate counsel had a conflict that motivated him not to raise issues with trial counsel's performance that could potentially serve as cause for default, but Petitioner has failed to substantiate that claim.  "As petitioner has failed to excuse his procedural default, 'considerations of comity and federalism bar the federal court's review.'"  Yeboah-Sefah, 556 F.3d at 76 (quoting Simpson v. Matesanz, 175 F.3d 200, 206 (1st Cir. 1999)).

For completeness, the Court also notes that Petitioner has failed to explain how he has been prejudiced.  In this context, "[t]o show prejudice, [the Petitioner] must demonstrate 'not merely that the errors . . . created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions.'" Costa, 673 F.3d at 26 (emphasis omitted) (quoting Murray, 477 U.S. at 494).  The Court finds that Petitioner has failed to carry this burden, and for this additional reason, cannot excuse his procedural default.

The Court therefore finds that habeas relief is not warranted based on Issues #7–10.[12]

ii.    Issue #11

As to Issue #11, Petitioner asserts that appellate counsel was ineffective in failing to raise the ineffective assistance of trial counsel claims discussed above, [ECF No. 2 at 54–55], related to trial counsel's alleged failure to challenge the Commonwealth's experts, retain their own experts or investigators, request certain jury instructions, present certain exculpatory evidence, present an alibi defense, and object to the prosecution's closing argument, [S.A. II at 24–43].

Unlike Issues #7–10, Issue #11 relates to appellate counsel's assistance associated with filing Petitioner's Consolidated Appeal, and therefore Petitioner could not have raised this issue, in this form, earlier than he did, which was in his Second Motion for a New Trial.  [ECF No. 2 at

---

[12] There is also a narrow exception that allows for review where a petitioner "demonstrate[s] that failure to consider the claims will result in a fundamental miscarriage of justice."  Coleman, 501 U.S. at 750.  A "fundamental miscarriage of justice" occurs "where a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Murray, 477 U.S. at 496. "The miscarriage-of-justice exception is narrow and applies only in extraordinary circumstances—circumstances in which a petitioner makes some showing of actual innocence." Janosky v. St. Amand, 594 F.3d 39, 46 (1st Cir. 2010) (first citing Murray, 477 U.S. at 496; and then citing Burks v. Dubois, 55 F.3d 712, 717–18 (1st Cir. 1995)).  While the Petitioner maintains that he is innocent, [ECF No. 2 at 48], he does not present any evidence that would clear the high bar for this exception to apply.

54–55; S.A. II at 25–45].  That said, "the SJC has rejected the argument that an ineffective

assistance of appellate counsel claim is categorically 'new,' and the First Circuit has endorsed

that principle in the context of finding procedural default of ineffective assistance of appellate

counsel claims on federal habeas review."  Souza v. Mendonsa, No. 12-cv-10705, 2013 WL

4517978, at *4 (D. Mass. Aug. 23, 2013); see Gunter, 945 N.E.2d at 394; Costa, 673 F.3d at 24

n.4.  If an ineffective assistance of trial counsel could have been raised on direct appeal, a

Petitioner cannot "avoid the 'new-and-substantial' bar merely by recasting those same arguments

as ineffective assistance of *appellate* counsel."  Souza, 2013 WL 4517978, at *4 (emphasis

added).  The Court finds that Petitioner's claims for ineffective assistance of appellate counsel do

functionally recast his claims for ineffective assistance of trial counsel.  Likewise, as discussed

above, Petitioner's speculative conflict argument is insufficient to excuse failing to raise them

earlier, and therefore Issue #11 is not new and has been procedurally defaulted.  He again has

failed to demonstrate cause for the default, or actual prejudice resulting from the default, and

therefore the Court is barred from reviewing this issue.

        iii.      Issue #6

As to Issue #6 ("In the exercise of its extraordinary powers under G.L. c. 278 § 33E, this

Court should order a new trial or direct the entry of a lesser degree of guilt"), [ECF No. 2 at 47–

49], Petitioner appears to be quoting from his Consolidated Appeal brief, drafted by his appellate

counsel, [ECF No. 2-1 at 50], and seems to be suggesting that appellate counsel's request for

"entry of a lesser degree of guilt," constituted ineffective assistance of counsel, see [ECF No. 2

at 48].

As with Issue #11, Petitioner may not have been able to raise this issue earlier, and

therefore the single justice's denial of his application of appeal may have rested on a

determination that the claim was "not substantial," rather than "not new," which would not warrant a finding of procedural default.  See [S.A. II at 257–58 (order denying leave to appeal)]. That said, even assuming this claim was exhausted and considering it de novo, the Court nonetheless finds that Petitioner has failed to raise any argument as to how he was prejudiced by this decision by counsel, which is required for an ineffective assistance claim.  See Jewett v. Brady, 634 F.3d 67, 75 (1st Cir. 2011) ("The clearly established federal law governing ineffective assistance of counsel claims is the framework established in Strickland.  On direct review under Strickland, a criminal defendant must show that his attorney's performance was deficient and that he was prejudiced—deprived of a fair trial—as a result." (internal citations omitted) (first citing Williams, 529 U.S. at 390–91; and then citing Strickland v. Washington, 466 U.S. 668, 687 (1984))).  Habeas is therefore not appropriate on this ground.

                        iv.      Issue # 12

        Finally, as Respondent correctly points out, Issue #12 ("The SJC decision was contrary to established federal law and was based on an unreasonable determination of facts") "does not state a claim for relief but merely recites the habeas standard of review."  [ECF No. 33 at 48]. Issue #12 is not a separate ground for relief, but, as discussed above, the Court applies this standard in evaluating other Issues.

        **B.      Subsequent Motions Related to Petitioner's Third Motion for a New Trial**

        In his Third Motion for a New Trial, Petitioner raised new claims of ineffective assistance of counsel, related to eyewitness identification evidence and counsel's failure to retain an identification expert and to seek specific jury instructions, [ECF No. 35-1 at 9–21], which were not raised in his Petition, see [ECF Nos. 1, 2].  As such, in order to properly put these issues before the Court, Petitioner must amend his Petition.  See Freeman v. Nolan, No. 05-cv-11383, 2012 WL 12919156 at *9 (D. Mass. Oct. 16, 2012) (finding that issues raised by

petitioner in subsequent state court filings but not raised in the original or amended habeas petition were "not properly before the court"). Federal Rule of Civil Procedure 15(a), which governs amendments to habeas petitions, see 28 U.S.C. § 2242 ("Application[s] for a writ of habeas corpus . . . may be amended or supplemented as provided in the rules of procedure applicable to civil actions."); Fed. R. Civ. P. 15; see also Taylor v. McDermott, No. 20-cv-11272, 2021 WL 294092, at *1 (D. Mass. Jan. 28, 2021) (applying Fed. R. Civ. P. 15 to petitioners' motion to amend their habeas petition), provides that leave to amend generally should be "freely give[n] . . . when justice so requires," Fed. R. Civ. P. 15(a)(2). "[E]ven so, [a] district court enjoys significant latitude in deciding whether to grant leave to amend." ACA Fin. Guar. Corp. v. Advest, Inc., 512 F.3d 46, 55 (1st Cir. 2008). A court may deny leave to amend for reasons including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." Foman v. Davis, 371 U.S. 178, 182 (1962).

The Court finds that any amendment to add these issues to the Petition would be futile, because these claims are not only unexhausted (which Petitioner appears to concede in seeking a stay and abeyance), but also without merit. As noted above, "[i]neffective assistance under Strickland is deficient performance by counsel resulting in prejudice." Rompilla v. Beard, 545 U.S. 374, 380 (2005) (citing Strickland, 466 U.S. at 687). "Performance . . . [is] measured against an 'objective standard of reasonableness,' 'under prevailing professional norms.'" Rompilla, 545 U.S. at 380 (quoting Strickland, 466 U.S. at 687–88). Prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687. "Unless a defendant makes both

showings, it cannot be said that the conviction . . . resulted from a breakdown in the adversary process that renders the result unreliable."  Id.

The Court agrees with the trial court's assessment in denying Petitioner's Third Motion for a New Trial that "[Petitioner]'s case did not turn on an eyewitness identification," and "[a]s such, there is no basis to believe or find that testimony which might have been provided by an Expert Witness on Identification," or "any additional jury instruction, would have led to a different outcome."  [ECF No. 41-1 at 130].  Therefore, the Court finds Petitioner has failed to establish that he was prejudiced by trial or appellate counsel's alleged ineffectiveness.  Further, Petitioner does not provide any evidence pointing to his trial counsel's performance falling below the Strickland standard.

The Court finds that amending the Petition to add these issues would be futile and therefore denies Petitioner's motion to amend his Petition.  Because these issues are not before the Court, Petitioner's motion to stay this action to exhaust his state court remedies for these issues, and his other related motions, are likewise DENIED as moot.

## IV.     CONCLUSION

Accordingly, the petition for a writ of habeas corpus, [ECF No. 1], and Petitioner's Subsequent Motions, [ECF Nos. 35, 40, 41, 48, 51], are DENIED.  "The district court must issue or deny a certificate of appealability when it enters a final order adverse to [a habeas petitioner]." Rules Governing Section 2254 Cases, R. 11(a); see also 28 U.S.C. § 2255(c) ("A certificate of appealability may issue . . . only if the [habeas petitioner] has made a substantial showing of the denial of a constitutional right.").  The Court will issue a certificate of appealability given the number of issues raised and the serious nature of the crime and sentence at issue.  See Miller-El v. Cockrell, 537 U.S. 322, 327 (2003) (stating that a certificate of appealability may be issued

where "jurists could conclude the issues presented are adequate to deserve encouragement to

proceed further").


        **SO ORDERED.**

February 9, 2024                          /s/ Allison D. Burroughs
                                                    ALLISON D. BURROUGHS
                                                    U.S. DISTRICT JUDGE